DECISION AND JOURNAL ENTRY
{¶ 1} Elizabeth S. ("Mother") has appealed from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor children, H.P. and K.P., and placed them in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.
 I. {¶ 2} Mother is the parent of HP., born April 17, 1997, and K.P., born March 28, 1998. The biological father of the children, Melvin P., has not appealed from the judgment of the trial court.
 {¶ 3} On October 11, 2007, LCCS filed complaints in the juvenile court, alleging that both children were neglected and dependent, and sought temporary custody of them. The agency had been involved with the family when the children were infants, and it has more recently been providing in-home services designed for housekeeping and parenting skills for the past year. *Page 2 
The present case included allegations that one of Mother's boyfriends had sexually abused K.P. and, also, that Mother had taken the children to that man's home where the children were offered beer, cigarettes, and marijuana. In addition, the complaint alleged that ten-year-old K.P. had been hospitalized twice during the summer of 2007 as a result of suicide threats and extreme behavior at school. That behavior included throwing a desk, locking his teacher in a room, threatening to find a sharp object to cut himself, and threatening to throw himself off a bridge. The agency also expressed concern with family interactions observed at the hospital. Eleven-year-old H.P. reportedly functioned in a parenting role and calmed K.P., while Mother yelled and screamed at him. This case was initiated when the children actually contacted someone because they were concerned with Mother's safety. Mother had brought a man home from the grocery, and he reportedly engaged in sexual activity with Mother in front of the children. The children were concerned that he would be coming back to the house the next day while they were in school and they were worried about Mother's safety. The individual contacted by the children notified LCCS.
 {¶ 4} In general, the agency was concerned that the children's emotional, medical, educational, and nurturing needs were not being met, and that the children had been sexually abused and were at risk of further abuse. Accordingly, a case plan was developed which required Mother to: (1) obtain a psychological evaluation; (2) attend parenting classes; (3) keep the home safe and sanitary; and (4) not permit strangers and unsafe people in the home and not take rides from them. On December 27, 2007, the trial court adjudicated the children neglected and dependent and granted temporary custody to LCCS. On September 16, 2008, LCCS moved for permanent custody. Following a hearing, the trial court granted the agency's motion for permanent custody, finding that the children could not be placed with either parent within a *Page 3 
reasonable time or should not be placed with a parent and, furthermore, that it was in the best interests of the children to be placed in the permanent custody of the agency. Mother has timely appealed and has assigned two errors for review.
 II. Assignment of Error I. "The trial court erred in awarding permanent custody where there was a strong parent/child bond."
 Assignment of Error II. "The trial court's decision was against the manifest weight of the evidence."
 {¶ 5} Through her two assignments of error, Mother has asserted that the evidence did not support the trial court's finding that permanent custody was in the best interests of the children. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also,In re William S. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quotingCross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. *Page 4 
 {¶ 6} The trial court found that the first prong of the permanent custody test was satisfied because the children could not be placed with either parent within a reasonable time or should not be placed with a parent. See R.C. 2151.414(B)(1)(a). Mother has not challenged that finding. She has challenged only the trial court's finding on the best interest prong of the permanent custody test. See R.C. 2151.414(B)(1).
 {¶ 7} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider: (1) the child's personal interactions and relationships; (2) the child's wishes regarding placement; (3) the custodial history of the child; (4) whether there are appropriate alternatives to permanent custody: and (5) whether any of the factors in R.C. 2151.414(E)(7) to (11) apply. R.C. 2151.414(D). "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." In re Smith (Jan. 2, 2002), 9th Dist. No. 20711; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 8} The first best interest factor requires the trial court to consider the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the children. R.C. 2151.414(D).
 {¶ 9} Mother had suffered a brain injury in an automobile accident when she was 14 years old. As a result, she is mentally and physically impaired. She has a guardian over her estate since her IQ was reported to be 70, she walks with a severe limp, and her vision is impaired. Numerous referrals were made by the agency to help Mother with her case plan objectives. For instance, LCCS referred Mother to Firelands Regional Medical Center Counseling and Recovery Service where she was assisted by case manager Lauren Ann Harbeck, *Page 5 
as well as by a psychiatrist and counselor. Ms. Harbeck explained that Mother had been diagnosed with major depression, recurrent moderate and generalized anxiety, and traumatic brain injury with paralysis and cognitive impairment.
 {¶ 10} Ms. Harbeck attempted to help Mother comply with her LCCS requirements, problem solving, and redirecting negative thoughts into positive ones. Ms. Harbeck stated that Mother is very attached to her children and very concerned about getting them back in her custody. She said that since she had been working with Mother, her home was being kept clean and organized, and there was ample food available. Ms. Harbeck testified that Mother had difficulty staying focused on topics during their sessions. She also stated that Mother believed LCCS was involved with her family only because of lies that people told about her, even though she admitted that her children had been sexually abused.
 {¶ 11} Mother attended three group parenting sessions with clinical counselor Robert Reitman, who testified that he could tell from Mother's illogical and incongruent questions that she did not understand the material. Mr. Reitman then worked with Mother individually in her home for three or four weeks. Following those sessions, Mr. Reitman concluded that he could not make an impact on Mother's parenting skills, even on an individual basis. He testified that Mother failed to assume responsibility for her behavior and when she did assume responsibility, she would rationalize, justify, or minimize her erroneous behavior. She was also argumentative regarding safety issues. According to Mr. Reitman, Mother's most egregious behaviors were allowing a man who had molested K.P. to have access to her son again. He also noted that Mother was aware K.P. had observed her having sex with a man in the living room, and had observed other sexual activity in the home on another occasion. He does not believe Mother has accepted responsibility for the problems which precipitated the removal of her children, and, *Page 6 
based on his experience, he would have concerns about the children being returned to her. He stated that Mother lacks good judgment and the capacity to govern herself. He believes Mother does not have enough awareness of what she needs to do to protect her children.
 {¶ 12} K.P. had a history of serious behavioral problems. Therefore, Mother received additional parenting help from Anecia Wharton, a psychiatric therapist whose employment duties were to help families who have children with mental illnesses learn to manage their behaviors. At one point, K.P.'s problems were so severe that he was only permitted to attend school two hours per day. In addition, as might be expected, his grades were very poor. Ms. Wharton worked with K.P. and Mother for ten months after K.P.'s first hospitalization for suicidal ideations in March 2006. At that time, K.P. had been diagnosed with depressive episodes and was on medication. One concern was that Mother was not providing his medication regularly. After ten months, Mother ended the services because she believed K.P. had improved. Ms. Wharton testified that she did not believe services should have been terminated at that time.
 {¶ 13} Within six months and after K.P.'s second hospitalization in June 2007, Mother was advised to take K.P. back to Ms. Wharton. At that time, K.P. was diagnosed with acute stress disorder. Ms. Wharton attempted to work with K.P. and with Mother once again. Ms. Wharton testified that it often took several attempts to get Mother to adopt a particular skill, and even then, she would not use the skills consistently. She noted that Mother would make many inappropriate comments to her son. For example, according to Ms. Wharton, if K.P. were angry, Mother would call him "dumb." And after he was sexually abused, Mother said that "he asked for it." After such comments, K.P. would become angry, start to cry, and run to his room or out-of-doors. Ms. Wharton testified that her efforts to redirect Mother were usually unsuccessful. *Page 7 
 {¶ 14} Ms. Wharton continued working with K.P. after he was placed in foster care. Significantly, according to the therapist, K.P.'s behavior greatly improved within two to three weeks of such placement. K.P. was following directions, managing his anger, and working out problems with his sister. He was not as violent as before and was not swearing. Since entering foster care, he had not made any suicide threats and had not been hospitalized. He progressed from attending just two hours of school each day to normal classroom attendance. By July 2008, he was able to stop all medications, and by August 2008, Ms. Wharton was able to discharge K.P. from her services entirely.
 {¶ 15} There was evidence before the trial court that H.P. claimed she had been sexually abused by one of the men that Mother brought into the home. After H.P. told Mother what that man had done, Mother reportedly told H.P. to "shut up" and asked the man to remain in the home. H.P. testified to the Grand Jury in that case and the individual was indicted. At the time of the permanent custody hearing, he had not yet been tried. The record establishes that H.P. frequently took care of both her mother and her brother while they were living together. She even scheduled appointments for Mother. According to Anna Biczykowski, the caseworker assigned to this case, Mother reported that H.P. threatened to kill herself in the summer of 2007. At the time of the permanent custody hearing, H.P. was in counseling for sexual abuse, grief, and loss.
 {¶ 16} Ms. Biczykowski testified about Mother's parenting skills and the efforts of the agency to help her improve those skills. The caseworker confirmed that there was love and affection between Mother and the children. She said the children were happy to see Mother at visitations and that she always prepared good meals for them. However, there were significant and ongoing concerns with her ability to parent. Ms. Biczykowski explained that she discussed *Page 8 
the case plan with Mother, but that Mother did not appear to understand it. LCCS had made several efforts to help Mother with her parenting skills, but they were not successful. In addition to the previously mentioned efforts, the caseworker attempted to refer Mother to Catholic Charities for mentoring, but the agency would not initiate services because they had already worked with her for a long period of time without observing any progress, and they did not believe they could help her any further. Thinking that Mother might benefit from a non-classroom approach, the case aide also attempted to help Mother during visits
 {¶ 17} Despite these efforts, the caseworker testified that there was no improvement in Mother's parenting skills during the course of this case. The caseworker described the problematic way in which Mother would communicate with her children. She used a great deal of foul language, even immediately after being directed not to do so. Mother would swear at the children and frequently threatened to throw herself off a bridge. The caseworker explained that Mother's attitude often served to escalate the extreme behavior of her son. On one occasion, he yelled, "I hate you," to his mother, and she replied: "I hate you too, you little mother f***er." When advised that such talk hurts the children, she would nevertheless repeat it again. When Mother used profanity or threatened to harm herself, the children would often become upset, cry, and rock in a corner. She used the word "f***" regularly with the children, and talked to them about having sex with her boyfriends. The children told the caseworker that they had seen her engage in sexual activity with men. The caseworker explained that although the supervised visits were sometimes described in the visitation log as going well, the caseworker clarified that "a good visit with this mom is nobody is screaming, nobody is crying, * * * [and] she didn't say anything that was going to make the kids end up in the corner rocking, crying." *Page 9 
 {¶ 18} In October 2008, Mother asked the caseworker what would happen if the agency obtained permanent custody. When the caseworker told her that the children would be adopted, Mother told K.P. that, if that happened, she would move so far away he would never see her again. K.P. became very upset and started crying. His older sister, H.P., came to him and said that he should not be angry at Mother because she does not understand what she is saying.
 {¶ 19} The caseworker testified that when it became obvious that Mother was not going to stop making improper comments, she developed a system with the children where she could simply intervene and attempt to protect them. Mother and the children were required to stay within sight of the caseworker. The children would clap three times when Mother said something that was upsetting, and the caseworker would intervene. The caseworker testified that Mother did not seem to understand that her comments could be damaging to her children.
 {¶ 20} Mother's ability to keep her children safe was a continuing concern. Mother had a practice of accepting rides from strangers and permitting them into her home. Mother had even taken the children along with her in strangers' cars. According to Therapist Wharton, Mother said that she would meet people outside of a bar and bring them home that same night. Mother admitted that one of those people stole from her. Others have been charged with abusing her children. Despite being told that this unsafe behavior impacted the possibility of her children being returned to her, Mother failed to change her conduct. She accepted a ride from a stranger as late as one month before the permanent custody hearing. Caseworker Biczykowski, Clinical Counselor Reitman, and Therapist Wharton all expressed concern that Mother would not be able to keep inappropriate people out of her home.
 {¶ 21} The father, who met Mother in a homeless shelter, had not seen H.P. or K.P. for five years. He claimed he stayed away because he was afraid Mother would have him arrested. *Page 10 
He had a long history of substance abuse and two incarcerations for crimes involving domestic violence. He attended the adjudicatory and dispositional hearings and expressed an interest in visitation, but failed to follow-up by scheduling a visit. He also failed to engage in any of the matters included on his case plan.
 {¶ 22} Marilyn Parker Jeffries testified on Mother's behalf. As Mother's pastor and friend, she testified that Mother is self-sufficient in terms of shopping and cooking, and that she loves her children and wants them back. She did not know, however, whether Mother fully appreciated the seriousness of the sexually inappropriate matters that occurred with her children. She also testified to making efforts to assist mother with transportation needs where bus transportation was not available.
 {¶ 23} At the time of the permanent custody hearing, the children were placed in the same foster home and thriving. H.P. was doing very well in school and achieving good grades. K.P. was also doing well, although he has struggled because of his poor performance in the past. He has had no recent incidents of threatening to hurt himself or hospitalizations. The caseworker stated that the children have strongly bonded with the foster family.
 {¶ 24} The second best interest factor requires consideration of the children's wishes for permanent placement. Each child has, on occasion, expressed a desire to return to live with Mother. K.P. has also expressed other desires, including wanting to remain in the foster home. Madeline Koeth, the guardian ad litem, reported that both children are very happy in the foster home and doing very well there. No doubt, her opinion reflects, at least in part, K.P.'s significant behavioral improvements since entering foster care. It is also apparent that the children suffered significant harm and had considerable problems while in the care of their *Page 11 
mother. Ms. Koeth believes that it is in the best interests of both children to remain in the foster home.
 {¶ 25} The children had been in the custody of the agency for approximately one and one-half years at the time of the permanent custody hearing. They are currently placed together in the same foster home. The foster family is interested in adopting both children if permanent custody is granted.
 {¶ 26} The fourth best interest factor is the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. There was evidence before the trial court that the children need a legally secure placement and that neither parent could offer such a placement. According to the LCCS caseworker, Mother is not able to understand that her behavior places her children at risk and she is unwilling or unable to change that behavior. There was a great deal of evidence before the trial court that Mother's relationship with her children was detrimental to them. Father has not seen his children for several years and has not made any effort to comply with any of the matters asked of him. The caseworker believes that the children would be at risk if placed with him. Moreover, neither parent has any relatives for possible placement.
 {¶ 27} Mother has argued that the evidence did not clearly eliminate legal custody with the foster parents as a viable option. The caseworker testified that the foster parents were not willing to accept legal custody of the children. According to the caseworker, the foster mother was frightened that an arrangement of legal custody would leave the door open for Mother or Father to seek custody at a later date, and she was also unwilling to disclose her residential address to the parents. Mother disputes the credibility of that statement because the caseworker previously indicated that she had not discussed legal custody with the foster parents. The *Page 12 
argument is not persuasive, however, because Mother's attorney interrupted the caseworker's initial statement before it was completed and refused to allow her to explain. When the caseworker later had an opportunity to explain, she provided the reasons why legal custody was not an option with these foster parents. Moreover, the record does not support a finding that a continuation of the children's relationship with Mother would be in the best interest of these children. Indeed, there was little evidence of a healthy, positive relationship between the Mother and children. Rather, the evidence before the trial court indicates that Mother's interactions with these children jeopardized their mental and physical health.
 {¶ 28} The caseworker also stated that she did not believe an extension of temporary custody would be beneficial. She did not believe the children could be reunited with either parent within a reasonable period of time. The caseworker testified that she believes the children would benefit from adoption and that adoption required an award of permanent custody to the agency. She stated that she believes permanent custody is in the best interest of the children.
 {¶ 29} Finally, Mother has argued that she has been wrongly penalized because her cognitive ability is below average. In support of her contention, Mother has cited In re Lay (1987), 43 Ohio App.3d 78. The appellate court reversed an order of permanent custody in that case. The issue before the court in Lay was whether the parents had acted so as to leave the child without adequate parental care. It should first be noted that the legal test for permanent custody that existed at that time has been altered by the 1988 revisions of R.C. 2151.414. Consequently, the legal analysis used in permanent custody decisions prior to those revisions has been largely rendered inapplicable. See In re Culver (June 23, 1999), 9th Dist. No. 19285, at fn. 1. To the extent that the substantive facts of the case retain any vitality, however, they also fail to support Mother's position. *Page 13 
 {¶ 30} In Lay, the mother attended parenting classes, but made little progress; permitted her emotional needs to take precedence over her desire to provide parental care to her child; and was generally unable to place the safety and well-being of her child above her own emotional needs. Lay, 43 Ohio App.3d at 82. Although the mother made some progress in her ability to take care of her own needs, there was no evidence that she would be able to care for her child in the near future. Id. The decisional point for the reviewing court, however, was the progress of the father. The court found significant evidence that the father made every effort to be the best father he could. Id. He benefitted from parenting classes and from money management assistance. Id. There had been a "marked improvement" in his parenting skills and living arrangements. Id. Although the father was said to require substantial support from outside agencies, there was also evidence in the record that there were community agencies that could provide the needed support. Id.
 {¶ 31} Those facts are easily distinguished from the present case. Here, Mother sat through parenting classes, counseling sessions and even had private assistance in her home, but was unable to demonstrate that she had learned anything at all from the services that had been provided to her. Critically, however, there is no other parent who is able to provide appropriate care to the children in this case. In addition, there was no evidence that continuing community resources would have made a difference. Consequently, Lay does not support Mother's position.
 {¶ 32} Upon review, the record demonstrates that there was ample evidence before the trial court from which it could conclude that permanent custody was in the children's best interests. The trial court did not err in terminating Mother's parental rights and in placing H.P. and K.P. in the permanent custody of the agency. Mother's two assignments of error are overruled. *Page 14 
 III. {¶ 33} Mother's two assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
WHITMORE, J. DICKINSON, P. J. CONCUR *Page 1